## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-02263-RMR-MDB

HARRY COOPER,

Plaintiff,

v.

CITY OF PUEBLO, COLORADO, et al.,

Defendants.

---

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

---

*Plaintiff Harry Cooper ("Plaintiff"), appearing respectfully, submits this Response in Opposition to the Motion to Dismiss (Doc. 54) filed by Defendants the City of Pueblo and sixteen of its officers (collectively, "Defendants").*

"Good thing we got the guy 'cause we had no probable cause for a warrant."
-Sergeant Santino Oliva, Pueblo Police Department.

### TABLE OF CONTENTS

**TABLE OF CONTENTS**............................................................................................................ 1

**TABLE OF AUTHORITIES**..................................................................................................... 3

**I. INTRODUCTION**.................................................................................................................4

**II. FACTUAL BACKGROUND**................................................................................................6

A. Incident One: The Unlawful Entry and Retaliation (November 10, 2021)........................ 6

B. The Broken Promise: A Phony Investigation and False Assurances................................7

C. Incident Two: The Five-Hour Armed Siege (September 12, 2023)................................7

D. The Devastating Admission: "We Had No Probable Cause"............................................................. 9

E. Incident Three: Escalation to Economic Threats (November 2, 2024)............................................10

F. Incident Four: The Retaliatory Prosecution (August 20, 2025).......................................................11

**III. LEGAL STANDARD**...........................................................................................................11

A. MISCHARACTERIZING THE COMPLAINT IN VIOLATION OF THE RULE 12(B)(6) STANDARD.......................................................................................................................................13

B. PLAINTIFF'S CLAIMS FROM THE 2021 INCIDENT ARE NOT BARRED BY THE STATUTE OF LIMITATIONS................................................................................................................................ 13

C. The Institutional Deception Scheme Establishes Equitable Tolling and Fraudulent Concealment..14

D. The Continuing Violation Doctrine Applies to Defendants' Pattern of Harassment.......................15

E. THE COMPLAINT PLAINLY STATES CLAIMS FOR FOURTH AMENDMENT VIOLATIONS. 16

G. Defendants Repeatedly Conducted Unlawful Searches of Plaintiff's Home................................... 17

I. The Complaint Alleges Objectively Unreasonable and Excessive Force...........................................18

J. THE COMPLAINT PLAINLY STATES CLAIMS FOR FIRST AMENDMENT RETALIATION 19

K. THE COMPLAINT PLAINLY STATES A CLAIM FOR A SUBSTANTIVE DUE PROCESS VIOLATION..................................................................................................................................20

H. THE COMPLAINT PLAINLY STATES A MONELL CLAIM AGAINST THE CITY OF PUEBLO.......................................................................................................................................21

I. THE COMPLAINT PLAINLY STATES A CLAIM FOR CIVIL CONSPIRACY.........................22

J.   DEFENDANTS' ATTEMPT TO DISPUTE THE EXISTENCE OF THE RETALIATORY PROSECUTION IS DEMONSTRABLY FALSE AND MISLEADING.............................................. 23

K. THE COMPLAINT SUFFICIENTLY ALLEGES THE PERSONAL PARTICIPATION OF EACH DEFENDANT....................................................................................................................... 24

L.   DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.....................................24

**IV   CONCLUSION**...................................................................................................................26

A. Alternative Request for Leave to Amend........................................................................................ 27

## **TABLE OF AUTHORITIES**

### *Cases*

Ashcroft v. Iqbal, 556 U.S. 662 (2009)................................................................P 10

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)............................................P 10, 11

Collins v. Virginia, 138 S. Ct. 1663 (2018).......................................................P 16

Coors v. Sec. Life of Denver Ins. Co., 112 P.3d 59 (Colo. 2005)...................................P13

County of Sacramento v. Lewis, 523 U.S. 833 (1998).....................................................P 19

Dean Witter Reynolds, Inc. v. Hartman, 911 P.2d 1094 (Colo. 1996).........................P.. 13

Florida v. Jardines, 569 U.S. 1 (2013).................................................................P 15, 23

Fogarty v. Gallegos, 523 F.3d 1147 (10th Cir. 2008).................................................P 25

Fratus v. DeLand, 49 F.3d 673 (10th Cir. 1995)......................................................P 11, 12

Gonzalez v. Trevino, 602 U.S. 653 (2024)…………………………………………………P 18

Graham v. Connor………………………………………………………………………..…………P 18

Hall v. Bellmon, 935 F.2d 1106 (10th Cir. 1991)..............................................................P 11

Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179 (10th Cir. 2001)

…………………………………………………………………………..……………P 18, 25

Hunt v. Bennett, 17 F.3d 1263 (10th Cir. 1994)............................................................P 14

Katz v. United States, 389 U.S. 347 (1967)..................................................................P 17

Pembaur v. City of Cincinnati, 475 U.S. 469 (1986)......................................................P 20

Poole v. County of Otero, 271 F.3d 955 (10th Cir. 2001)............................................P 24

Robbins v. Oklahoma, 519 F.3d 1242 (10th Cir. 2008)..........................................P 11, 23

Silverman v. United States, 365 U.S. 505 (1961).....................................................P 15

Snell v. Tunnell, 920 F.2d 673 (10th Cir. 1990)...........................................................P 21

Soldal v. Cook County, 506 U.S. 56 (1992)...................................................................P 17

United States v. Carloss, 818 F.3d 988 (10th Cir. 2016).........................................P 16, 24

United States v. Jones, 565 U.S. 400 (2012).................................................................P 16

United States v. Reeves, 524 F.3d 1161 (10th Cir. 2008).........................................P 24

Wong Sun v. United States, 371 U.S. 471 (1963)......................................................P 17

Worrell v. Henry, 219 F.3d 1197 (10th Cir. 2000)....................................................P19, 24

### **FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 8…………………………………………………………………………………….P 12

Fed. R. Civ. P. 12(b)(6)..............................................................................P 3, 10, 11

Fed. R. Civ. P. 15(a)(2)................................................................................P 25

## I.    INTRODUCTION

This case stems from a disturbing and escalating campaign of constitutional violations perpetrated by officers of the Pueblo Police Department against Plaintiff Harry Cooper. What began with a single officer's unlawful entry into his home devolved over three years into a multi-officer, five-hour armed siege threatening chemical weapons against his family, repeated warrantless entries, explicit threats to destroy his family's business, and ultimately, a retaliatory criminal prosecution transparently designed to punish him for seeking to vindicate his rights in federal court.

The Second Amended Complaint is not a collection of conclusory allegations. It is a meticulous, 45-page recitation of facts, dates, names, and direct quotes from body-worn camera footage that paint a damning picture of lawlessness and retaliation. The Complaint details how City of Pueblo police officers, in response to Plaintiff's lawful assertion of his constitutional rights, engaged in a coordinated effort to harass, intimidate, and punish him. It alleges how supervisors not only tolerated this misconduct but actively participated in it and conspired to cover it up. It describes how the City's internal disciplinary systems failed, ratifying this unconstitutional conduct and fostering a culture of impunity that made each subsequent violation inevitable.

Defendants now move to dismiss every claim against every officer and the City itself. Their motion is a wholesale attack on the Complaint that systematically ignores the stringent standard of review at this stage of litigation. Defendants:

Mischaracterize the Complaint, violating the basic tenets of Rule 12(b)(6) analysis by disputing and altering the well-pleaded facts.

Minimize their own alleged conduct, arguing that a five-hour armed siege with explicit threats to "gas first then come in" is not excessive force, and that retaliating against a citizen by towing his car and threatening to shut down his family's business is not an "adverse action."

Assert a statute of limitations defense that is defeated on the face of the Complaint by the well-pleaded facts establishing a continuing violation and an institutional deception scheme that equitably tolls the statute.

Claim a lack of personal participation by ignoring the specific allegations detailing which officers were involved in which constitutional violations.

Seek refuge in qualified immunity, a defense that is entirely inappropriate at the pleading stage when the Complaint alleges blatant violations of the most clearly established constitutional Rights, the sanctity of the home and the right to speak out against government misconduct without fear of reprisal.

The facts alleged in the Complaint, taken as true, are more than sufficient to "raise a right to relief above the speculative level." The roadmap of this opposition will follow the structure of Defendants' motion, systematically dismantling each argument for dismissal and demonstrating, claim by claim, that the Complaint properly alleges plausible claims for relief against all Defendants. This Court should deny the motion in its entirety and allow this case to proceed to discovery, where the full scope of Defendants' misconduct will be brought to light.

## II.    FACTUAL BACKGROUND

At the motion to dismiss stage, the Court must accept all factual allegations in the Complaint as true and construe them in the light most favorable to the Plaintiff. The following is a summary of the detailed facts set forth in Plaintiff's Second Amended Complaint (Doc. 42).

Plaintiff Harry Cooper lives with his family in a private residence located above a commercial bar at 112 W 7th Street in Pueblo. His home is a complete and separate residence, accessible only through a private entrance and stairwell clearly marked with a "NO TRESPASSING" sign. (Doc. 42 at 7). This private stairwell and entrance are part of his residential property, legally and physically distinct from the public areas of the bar below. (Id.).

### A. Incident One: The Unlawful Entry and Retaliation (November 10, 2021)

On the night of November 10, 2021, Plaintiff became the victim of a crime when an arsonist set his car on fire. (Doc. 42 at 7). After reviewing security footage, Plaintiff went out to search for the perpetrator. (Doc. 42 at 8). While he was gone, witnesses that Plaintiff lived in the private residence upstairs, informed Officer Chad Albaugh, who was responding to the arson call. (Id.). Despite this knowledge, and without a warrant, consent, or any exigent circumstances, Officer Albaugh passed the "NO TRESPASSING" sign, ascended the private stairwell, and unlawfully entered Plaintiff's home. (Id.).

When Plaintiff returned and confronted Officer Albaugh exiting his home, Albaugh offered no apology or legal justification, instead becoming defensive. (Id.). In direct and immediate response to Plaintiff's verbal protest of the illegal entry, Officer Albaugh engaged in a stark act of retaliation. He had Plaintiff's vehicle—the very evidence of the arson—unlawfully towed from Plaintiff's own property. (Id.). Dash camera footage captured Albaugh stating, "I guess I'll mark it abandon," a deliberate falsehood he communicated to Sergeant Alan Peil as the pretext for the tow. (Doc. 42 at 31). Plaintiff was forced to pay fees but was never able to retrieve his car, which was an irreplaceable gift from his late sister. (Doc. 42 at 9). The message from the Pueblo Police was clear: "challenge the police and face consequences." (Id.).

**B. The Broken Promise: A Phony Investigation and False Assurances**

Following this incident, Plaintiff filed a formal, Level 1 complaint with the Pueblo Police Department, alleging a constitutional violation. (Doc. 42 at 9). Instead of a proper Internal Affairs investigation as required by policy, Captain Zach Ballas improperly diverted the complaint to Sergeant Brandon Beauvais, a field supervisor lacking the authority for such an investigation. (Id.).

Sergeant Beauvais contacted Plaintiff and made specific promises to resolve the situation, designed to dissuade Plaintiff from pursuing legal action. (Id.). The key promise was the implementation of a permanent alert in the police computer-aided dispatch (CAD) system that would explicitly identify Plaintiff's upstairs quarters as a private residence to prevent future unlawful entries. (Doc. 42 at 10). Relying on this official promise, Plaintiff forbore taking immediate legal action. (Id.). However, this crucial CAD alert was either never implemented or was systematically ignored by Pueblo police officers in the years that followed. (Id.).

**C. Incident Two: The Five-Hour Armed Siege (September 12, 2023)**

Nearly two years later, on September 12, 2023, the situation escalated dramatically. While Plaintiff was at home with his family, Officers Thomas McLallen and Marcus Duran responded to a report of a domestic violence suspect near the bar below. (Doc. 42 at 10). After briefly thinking they saw the suspect go toward the back of the bar, the officers did not pursue him. Instead, they went to the front entrance of Plaintiff's private residence and began pulling on the locked door. (Id.).

Joined by other officers, they gained access to a non-public kitchen area of the bar, which contained a door leading to Plaintiff's private stairwell. (Doc. 42 at 12). Officer McLallen claimed to see the top half of the suspect's face up the private stairs. (Id.). Without a warrant and with no evidence the suspect posed any imminent threat, McLallen and Duran drew their weapons and chased the individual up the first flight of Plaintiff's private stairs, stopping on the landing outside his door. (Id.). The promised CAD alert had completely failed. (Id.).

When officers made contact, Plaintiff clearly and reasonably asserted his constitutional rights, stating they would not be permitted to search his home without a valid warrant. (Id.). Rather than respecting this right, the officers immediately became hostile. They accused Plaintiff of harboring a fugitive and threatened him and his family with bogus criminal charges for "guns" and "drugs" if they were forced to get a warrant. (Doc. 42 at 13).

The threats escalated when Officers McLallen and Duran threatened SWAT deployment. As captured on body-worn camera, they told Plaintiff: "The SWAT team doesn't care if you want to comply, they gas first then come in." (Id.). This was not an idle threat; Officer McLallen was recorded checking on the SWAT team's status as they were actively preparing to deploy to the location. (Id.). These threats of chemical and tactical assault were made against an unarmed man and his family, secured in their own home, whose only "offense" was demanding the police follow the Constitution. (Doc. 42 at 14).

Supervisors on scene, Sergeant Anthony Masciotra and Sergeant Santino Oliva, did nothing to de-escalate. Instead, they "allowed and participated in the escalating threats." (Doc. 42 at 15). Fearing for his family's safety, Plaintiff called 911 and also told Officer McLallen directly by phone that he would cooperate fully upon presentation of a valid search warrant. (Id.).

Despite this explicit offer of peaceful cooperation, the officers initiated and maintained an armed siege of Plaintiff's home for approximately five hours. (Id.). Officer McLallen was captured on camera stating, "no one is going up and no one is coming down," confirming the officers were unlawfully seizing Plaintiff and his family inside their home. (Id.). The trauma was so severe that Plaintiff's daughter, terrified she would witness police kill her father, moved out of the family home. (Id.).

### D. The Devastating Admission: "We Had No Probable Cause"

After five hours, the entire siege was rendered a farce when the actual suspect was found hiding in the curtilage outside the home, about ten feet from where the officers had been positioned. (Doc. 42 at 16).

What happened next is a dispositive admission of unconstitutional conduct, captured on body-worn camera. With the suspect in custody, a supervising officer, Sergeant Oliva, explicitly stated: "Good thing we got the guy 'cause we had no probable cause for a warrant." (Doc. 42 at 17). He continued, "That eliminates all our probable cause." (Id.). This extraordinary admission confirms that a police supervisor knew the entire five-hour armed siege, the threats of chemical warfare, and the seizure of Plaintiff's family were conducted without the barest constitutional justification. (Id.).

The misconduct continued even after this admission. Sergeant Oliva was captured on camera conspiring with Officer Eugene Chavez to alter police reports "Off camera and all that stuff." (Id.). Oliva also instructed officers to falsify their witness identification of the suspect. (Id.). Tellingly, an audit confirmed Sergeant Oliva deliberately failed to activate his own body camera during the entire incident, in violation of department policy. (Doc. 42 at 18).

**E. Incident Three: Escalation to Economic Threats (November 2, 2024)**

On November 2, 2024, officers once again violated Plaintiff's rights. Officers Duran, Proctor, Pfeifer, Markarian, Berumen, Chongway, and Sergeant Vahlbusch responded to an unrelated incident at the bar. (Doc. 42 at 18). Despite having no warrant and being explicitly warned by bar staff—"You can't go up there, it's private quarters"—the officers again entered the back area and ascended the private stairs to Plaintiff's residence. (Id.).

When confronted at his door, Plaintiff appropriately demanded they leave. (Doc. 42 at 19). In response, the officers escalated to threats against the family business. Multiple officers explicitly threatened to "call the liquor board and have this bar shut down." (Id.). Officer Pfeifer told Plaintiff he would "be the cause of getting the bar closed down." (Id.). The personal animosity was palpable. Officer Duran was captured stating, "We always have a problem with this guy, he is being an asshole like he always is," demonstrating a pre-existing animus based on Plaintiff's prior assertions of his rights. (Id.). During this encounter, Officer Proctor attempted to physically manipulate Plaintiff's door handle, and other officers admitted to eavesdropping on his private phone calls. (Id.).

**F. Incident Four: The Retaliatory Prosecution (August 20, 2025)**

The final act of retaliation was the most brazen. On July 22, 2025, Plaintiff filed this federal civil rights lawsuit. (Doc. 42 at 22). On August 12, 2025, a federal summons was served on Defendant Sergeant Brandon Beauvais. (Id.).

Exactly eight days later, on August 20, 2025, the District Attorney for the 10th Judicial District—who is Sergeant Beauvais's wife—filed a slate of criminal charges against Plaintiff.

(Doc. 42 at 22-23). These charges stemmed from a minor traffic incident that had occurred nearly two years earlier, in September 2023. (Doc. 42 at 21, 23). The Pueblo County District Attorney's Office had possessed all the evidence related to that incident for 23 months and had taken no action. (Doc. 42 at 22). The only intervening event between the 23 months of inaction and the sudden filing of felony charges was the service of this lawsuit upon the District Attorney's husband. (Doc. 42 at 23).

The charges themselves are legally dubious, including a double jeopardy violation for re-prosecuting a traffic charge to which Plaintiff had already pled guilty and been sentenced. (Doc. 42 at 24). The timing and spousal relationship demonstrate a clear and plausible retaliatory intent designed to punish Plaintiff for exercising his First Amendment right to petition the courts for redress of grievances. (Doc. 42 at 41).

### III.    LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint need only contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff pleads factual content that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. This standard is not a "probability requirement," but it asks for "more than a sheer possibility that a defendant has acted unlawfully." Id.

The Court's inquiry is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679. Two fundamental principles guide this inquiry. First, the court must accept all of the plaintiff's well-pleaded factual allegations as true.

Id. at 678-79. Second, the court must view these allegations in the light most favorable to the plaintiff. See Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008). In essence, the Court must determine whether the complaint "give[s] the defendant fair notice of what the...claim is and the grounds upon which it rests." Twombly, 550 U.S. at 555. Dismissal on statute of limitations grounds is proper only when the bar is apparent on the face of the complaint. Fratus v. DeLand, 49 F.3d 673, 676 (10th Cir. 1995).

Further, because Plaintiff is proceeding pro se, his pleadings are to be construed liberally and held to a "less stringent standard than formal pleadings drafted by lawyers." Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991). While the court cannot act as the plaintiff's advocate, the liberal construction rule means that "if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so despite the plaintiff's failure to cite proper legal authority, his confusion of various legal theories...or his unfamiliarity with pleading requirements."

## IV.    ARGUMENT

Defendants' Motion to Dismiss raises a series of arguments, each of which fails under the governing legal standard. Plaintiff's Complaint contains more than enough factual detail to state plausible claims for relief against all Defendants.

### A.  MISCHARACTERIZING THE COMPLAINT IN VIOLATION OF THE RULE 12(B)(6) STANDARD

Defendants' Motion to Dismiss (Doc. 54) mischaracterizes the Second Amended Complaint (Doc. 42). Rule 12(b)(6) analysis requires strict adherence to the operative complaint. For instance, Defendants incorrectly assert that "Markarian and Duran responded to the bar on a

report that a domestic-violence suspect was at the bar," citing "(Doc. 42 at p. 12)." (Doc. 54 at 5). Correct claim found on page 10 of Doc. 42, states that Officers Thomas McLallen and Marcus Duran "responded to the bar based on a report that a domestic-violence suspect named Michael with an active warrant frequents the bar." (Doc. 42 at 10). This misrepresentation confuses the officer identities and the factual basis, creating a purported exigency not alleged in the Complaint. Under Rule 8, the factual narrative of the Complaint governs, and it clearly alleges each defendant's involvement.

**B.    PLAINTIFF'S CLAIMS FROM THE 2021 INCIDENT ARE NOT BARRED BY THE STATUTE OF LIMITATIONS**

Defendants first argue that Claims 1, 7, and 12, which arise from the November 10, 2021 incident involving Officer Albaugh, are barred by Colorado's two-year statute of limitations because the original complaint was filed on July 22, 2025. (Doc. 54 at p 11-12). Defendants seek to benefit from their own fraudulent concealment and false promises—conduct that their motion systematically ignores. Their mechanistic application of the statute of limitations is improper at this stage because equitable tolling and estoppel are fact-intensive defenses that cannot be resolved on the pleadings. Fratus v. DeLand, 49 F.3d 673, 676 (10th Cir. 1995).

**C.    The Institutional Deception Scheme Establishes Equitable Tolling and Fraudulent Concealment.**

The Complaint details a calculated scheme of institutional deception designed specifically to bypass litigation. After the unlawful entry, Plaintiff filed a formal complaint that qualified as a "Level 1 Complaint"—the most serious category reserved for constitutional violations. (Doc. 42 at 9). Captain Zach Ballas, a final policymaker with authority over

complaint procedures, intentionally diverted Plaintiff's complaint away from Internal Affairs to

Sergeant Brandon Beauvais, a field supervisor who lacked authority to conduct such formal

investigations. (Id.).

This diversionary tactic violated department policy and signaled institutional bad faith.

During this sham "investigation," Beauvais made specific, official promises designed to resolve

Plaintiff's concerns and avoid litigation. He promised to create a specialized computer-aided

dispatch (CAD) alert that would flag Plaintiff's address as a private residence, "specifically

designed to prevent future entries by clearly marking the residential nature of the property."

(Doc. 42 at 10).

Plaintiff explicitly relied on these official assurances. Rather than immediately filing suit,

Plaintiff gave the department time to implement the promised reforms—exactly what Defendants

intended. The limitations clock continued running while Plaintiff reasonably believed the

constitutional violations had been addressed. Colorado law is clear: defendants cannot benefit

from limitations periods they manipulated through false promises. Dean Witter Reynolds, Inc. v.

Hartman, 911 P.2d 1094, 1097–99 (Colo. 1996) (equitable tolling applies when defendant's

conduct induced plaintiff's delay).

Furthermore, Defendants' diversion of a constitutional complaint combined with false

assurances constitutes fraudulent concealment. "The statute of limitations does not begin to run

until the plaintiff discovers, or reasonably should have discovered, the fraudulent concealment."

Coors v. Sec. Life of Denver Ins. Co., 112 P.3d 59, 66 (Colo. 2005). Plaintiff could not have

"reasonably discovered" the fraudulent nature of Beauvais's promises until the subsequent

violations in 2023 and 2024 proved the CAD alert was either never implemented or was

systematically ignored. These factual allegations, accepted as true, establish equitable tolling and fraudulent concealment.

**D. The Continuing Violation Doctrine Applies to Defendants' Pattern of Harassment.**

The incidents form a continuing pattern of constitutional violations involving the same location, same constitutional rights, and same institutional policies. Under the continuing violation doctrine, "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period." Hunt v. Bennett, 17 F.3d 1263, 1266 (10th Cir. 1994).

The Complaint does not merely allege discrete, unrelated acts. It alleges a clear, escalating pattern of harassment and retaliation all centered on Plaintiff's residence and his assertion of constitutional rights. The November 2021 unlawful entry and retaliatory car towing (Doc. 42 at 8) was the genesis of this pattern. It was followed by the Department's sham investigation (Doc. 42 at 9), the armed siege in 2023 (Doc. 42 at 10), another unlawful entry in 2024 (Doc. 42 at 18), and the retaliatory prosecution in 2025 (Doc. 42 at 22).

These are an unbroken chain of events linked by a common retaliatory motive against Plaintiff for standing up for his rights. The Complaint explicitly alleges that Officer Duran's statement in 2024—"We always have a problem with this guy"—demonstrated a "pre-existing animosity based on Cooper's previous assertions of his rights." (Doc. 42 at 19). Because the later acts fall within the limitations period, the continuing violation doctrine renders the entire pattern actionable.

**E.  THE COMPLAINT PLAINLY STATES CLAIMS FOR FOURTH AMENDMENT VIOLATIONS**

Defendants next argue that Plaintiff has failed to state any claim under the Fourth Amendment. (Doc. 54 at 12-15). These arguments require the Court to ignore the Complaint's specific factual allegations and draw inferences in Defendants' favor, which is impermissible at this stage.

**F.  Defendants Fundamentally Misunderstand the Fourth Amendment.**

Defendants argue that "absent a seizure of a person or property, it is unclear how law enforcement presence and efforts to carry out an investigation without entering or seizing a person can state a claim for relief." (Doc. 54 at 13). This statement reveals a fundamental misunderstanding of the Fourth Amendment, which protects against unreasonable searches and unreasonable seizures two distinct protections. An unlawful search does not require a seizure. See Florida v. Jardines, 569 U.S. 1, 6 (2013) (officer's entry onto porch with drug dog was unlawful search even though nothing was seized); Silverman v. United States, 365 U.S. 505 (1961) (physical intrusion to eavesdrop was unlawful search). A warrantless entry into a home or its curtilage is unconstitutional whether or not officers seize any person or property.

**G.  Defendants Repeatedly Conducted Unlawful Searches of Plaintiff's Home.**

The "very core" of the Fourth Amendment is the right to be free from unreasonable government intrusion in one's home, a protection that extends to the home's "curtilage." Jardines, 569 U.S. at 6. Defendants' Fourth Amendment argument collapses under its own weight. On page 4 of their motion, Defendants expressly recount Plaintiff's allegation that "Officer Albaugh had entered Cooper's private residence without obtaining a warrant." (Doc. 54

at 4). Yet on page 13, they assert "there are no allegations to indicate that any Defendant ever went through Plaintiff's door." (Doc. 54 at 13). A motion to dismiss is not a vehicle to dispute facts. By repeating Plaintiff's own allegation of warrantless entry, then denying its existence, Defendants concede the claim is plausible.

Further, there was no implied license for the officers to enter Plaintiff's private stairwell. To reach it, officers had to enter the public bar, go through a private kitchen, open a door into a non-public hallway, and proceed up the stairwell marked "No Trespassing." (Doc. 42 at 7, 12).

This is not a path "customarily open to the public." Jardines, 569 U.S. at 8. Bar staff specifically warned them the area was private and off-limits. (Doc. 42 at 18). As argued by then-Judge Gorsuch, a homeowner can explicitly revoke any implied license through clearly posted "No Trespassing" signs. United States v. Carloss, 818 F.3d 988, 1000 (10th Cir. 2016) (Gorsuch, J., dissenting). Defendants cannot invoke an implied license where none exists. Collins v. Virginia, 138 S. Ct. 1663, 1671 (2018).

**H. The Complaint Plausibly Alleges a Trespass Search, Attempted Forced Entry, and Eavesdropping.**

Defendants argue they are "not aware of case law holding that manipulating a door handle, without more, rises to the level of a constitutional violation." (Doc. 54 at 14). This ignores controlling authority cited in the Complaint. Under United States v. Jones, 565 U.S. 400 (2012), when law enforcement physically intrudes on private property to obtain information, a search has occurred. The Complaint alleges Officer Proctor "intentionally manipulated the handle of Plaintiff's door in an effort to force entry," a deliberate physical act to obtain information (i.e., whether the door was locked). (Doc. 42 at 28).

Defendants also completely ignore the second violation alleged in Claim 4: eavesdropping. The Complaint alleges that Officer Proctor used his unlawfully obtained position at Plaintiff's doorway as a listening post to overhear Plaintiff's private phone conversation inside the home, and that this was captured on camera. (Doc. 42 at 19). Using an unlawfully obtained position to extract information about communications occurring inside the home is a classic search that violates a reasonable expectation of privacy. Katz v. United States, 389 U.S. 347, 351 (1967). Any information Proctor obtained is fruit of the poisonous tree. Wong Sun v. United States, 371 U.S. 471, 484–85 (1963).

## I. The Complaint Alleges Objectively Unreasonable and Excessive Force.

On page 12 of their motion, Defendants assert that "Plaintiff was not arrested, charged, or subjected to any property seizure." (Doc. 54 at 12). This is offensively misleading. The Complaint alleges Plaintiff's home was physically seized for approximately five hours during an armed standoff. (Doc. 42 at 15). Officers explicitly stated, "No one is going up and no one is coming down," confirming Plaintiff and his family were unlawfully detained inside their residence. (Doc. 42 at 15). A seizure occurs when government action "meaningfully interferes with an individual's possessory interests in property," and the interference here could not have been more total. Soldal v. Cook County, 506 U.S. 56, 61 (1992).

Defendants argue there was no excessive force because "no Defendant ever pointed a gun or other weapon at Plaintiff" and "SWAT was not deployed." (Doc. 54 at 15). This ignores the terrifying nature of the threats and the devastating admission that destroys their defense. After a five-hour armed siege with explicit threats to "gas first then come in," Sergeant Oliva admitted

on camera: "Good thing we got the guy 'cause we had no probable cause for a warrant." (Doc. 42 at 17).

Defendants attempt to spin this admission as reasonable. (Doc. 54 at 22). Their logic is perverse: "It's constitutional to conduct a five-hour armed siege without probable cause as long as you don't actually submit the warrant you know will be rejected." This makes their conduct worse, not better. The admission proves they knew from the outset they lacked constitutional justification but conducted the siege anyway. Under Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179 (10th Cir. 2001), threats of severe force can constitute excessive force. The threats here were backed by a five-hour siege that officers admitted lacked any legal basis. The claim is exceptionally strong under the Graham v. Connor standard.

## J.  THE COMPLAINT PLAINLY STATES CLAIMS FOR FIRST AMENDMENT RETALIATION

On page 16 of their motion, Defendants portray Plaintiff's retaliation claims as "mere disagreement with police actions." (Doc. 54 at 16). This is false. The Complaint details a pattern where Plaintiff was targeted for asserting his rights. Evidence of retaliation is direct. Officers are heard saying, "We always have a problem with this guy, he's being an asshole like he always is," immediately before threatening to destroy Plaintiff's family business. (Doc. 42 at 19). These are admissions of animus.

Defendants argue that Plaintiff fails to allege any adverse action. (Doc. 54 at 16). This ignores both the facts and updated Supreme Court framework from Gonzalez v. Trevino, 602 U.S. 653 (2024), which clarifies plaintiffs need only provide objective evidence of retaliation. The Complaint provides overwhelming objective evidence:

Retaliatory Towing: After Plaintiff protested the warrantless entry, Officer Albaugh had his car towed under a false "abandoned" pretext. (Doc. 42 at 8).

Armed Siege: After Plaintiff demanded a warrant, officers initiated a five-hour armed siege and threatened to "gas" his family. (Doc. 42 at 13, 15).

Economic Threats and Coercion of a Child: Officers threatened to destroy the family business and coerced Plaintiff's daughter by threatening to find "guns and drugs" if they had to get a warrant. (Doc. 42 at 13, 19).

Retaliatory Prosecution: After Plaintiff filed this lawsuit, he was subjected to a baseless criminal prosecution. (Doc. 42 at 22).

These actions would chill a person of ordinary firmness from continuing to engage in protected speech. See Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir. 2000). The First Amendment claims are more than plausible.

### K.  THE COMPLAINT PLAINLY STATES A CLAIM FOR A SUBSTANTIVE DUE PROCESS VIOLATION

Defendants argue that because Plaintiff was not arrested, he cannot claim a due process violation and that he lacks standing. (Doc. 54 at 17). This misstates the claim. The Complaint alleges officers used official authority to threaten shutdown of the family business unless private security footage was surrendered, constituting economic coercion that shocks the conscience. County of Sacramento v. Lewis, 523 U.S. 833 (1998). Sergeant Vahlbusch's stated intent to contact the City Attorney to pursue liquor-license sanctions demonstrates the use of regulatory authority to circumvent Fourth Amendment protections. (Doc. 42 at 35).

Plaintiff has standing. He lives in the residence, works in the business, exercises supervisory authority, and was the direct target of the threats against "his bar." (Doc. 42 at 19). The unlawful police conduct directly injured his property interests, livelihood, and home.

## H. THE COMPLAINT PLAINLY STATES A MONELL CLAIM AGAINST THE CITY OF PUEBLO

Defendants argue the City is not liable because there is no underlying constitutional violation. (Doc. 54 at 18). This is incorrect. The Complaint alleges multiple municipal policies and customs that caused the violations

Deliberate Indifference: Captain Ballas intentionally diverted Plaintiff's Level 1 constitutional complaint away from Internal Affairs, violating department policy. (Doc. 42 at 9).

Ratification: Internal Affairs closed every allegation as "EXONERATED" or "UNFOUNDED" despite overwhelming video evidence, constituting ratification by final policymakers. Pembaur v. City of Cincinnati, 475 U.S. 469 (1986).

Failure to Train: The City's failure to train its officers on the proper boundaries of private residences, despite repeated complaints, constitutes deliberate indifference. The pattern of misconduct is so persistent and widespread as to constitute a "custom or usage" with the force of law.

Entrenched Custom: The mistaken belief across multiple officers and supervisors that they could use liquor licensing authority to circumvent the Fourth Amendment demonstrates an entrenched departmental custom of ignoring constitutional limits.

### I.    THE COMPLAINT PLAINLY STATES A CLAIM FOR CIVIL CONSPIRACY

Defendants argue the conspiracy claim is conclusory. (Doc. 54 at 19). The Complaint

details specific overt acts supported by recorded evidence.

2021 Conspiracy: Dashcam footage captured Officer Albaugh and Sergeant Peil

coordinating to retaliate by deliberately and falsely marking Plaintiff's vehicle as "abandoned" to

have it towed. (Doc. 42 at 31).

2023 Cover-Up Conspiracy: Body-worn camera footage captured Sergeant Oliva

directing Officer Chavez to make changes to reports "off camera and all that stuff" and ordering

officers to falsify witness identification to provide post-hoc justification for the unlawful siege.

(Doc. 42 at 17). Far from a passive supervisor, Oliva was the architect of a coordinated cover-up.

The Motion's silence on these facts is a material misrepresentation.

2024 Conspiracy: Multiple officers made coordinated threats to destroy the family

business through fraudulent liquor board complaints to coerce surrender of private evidence.

(Doc. 42 at 19).

These detailed allegations show sustained, unconstitutional conduct and a meeting of the

minds sufficient to state a claim for conspiracy. Snell v. Tunnell, 920 F.2d 673 (10th Cir. 1990).

### J.    DEFENDANTS' ATTEMPT TO DISPUTE THE EXISTENCE OF THE RETALIATORY PROSECUTION IS DEMONSTRABLY FALSE AND MISLEADING

In a stunning misrepresentation to this Court, Defendants contend they were "unable to

locate any pending criminal charges filed in the 10th Judicial District against Plaintiff" and that

"It is not clear that Plaintiff is being prosecuted". This contention is not merely incorrect; it is

directly contradicted by the Court's own docket in this very case. This is not a simple oversight;

it is an attempt to cast doubt on Plaintiff's credibility by insinuating he fabricated an entire

criminal prosecution.

The record is irrefutable. On August 29, 2025—more than five weeks before Defendants

filed their motion Plaintiff filed two crucial notices with the Court: * ECF 34: Titled "NOTICE

*RE: RETALIATORY PROSECUTION*," which gave all parties, including defense counsel,

explicit notice of the criminal case. * ECF 35: A "NOTICE *OF ERRATA*" which included as

attachments the actual (1) Criminal Complaint and (2) the State's Motion to Dismiss from that

prosecution.

Defendants' counsel, Ann Baumgartner Smith, was electronically served with both of

these documents on August 29, 2025, as confirmed by the Court's ECF notice. To now claim in a

formal pleading on October 6, 2025, that she was "unable to locate" a case for which she

possessed the charging documents and dismissal motion for over a month is profoundly

misleading.

Therefore, Plaintiff respectfully requests that the Court take judicial notice of its own

docket. ECF 34 and ECF 35 conclusively establish that a criminal case was initiated against

Plaintiff, that it terminated in his favor, and that Defendants had actual knowledge of these facts

long before filing their motion. Defendants' attempt to argue otherwise is baseless and should be

viewed as a reflection of the overall merit of their motion.

## K. THE COMPLAINT SUFFICIENTLY ALLEGES THE PERSONAL PARTICIPATION OF EACH DEFENDANT

Defendants' argument that the Complaint is an impermissible "shotgun pleading" is

demonstrably false. (Doc. 54 at 21-23). The Complaint is organized by incident and, within each

claim, identifies the specific officers involved, giving every single Defendant fair notice of the specific conduct they are alleged to have committed. See Robbins v. Oklahoma, 519 F.3d 1242, 1250 (10th Cir. 2008). The claims are not impermissibly lumped together; they are directed at the specific officers who jointly participated in discrete constitutional violations.

## L.  DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

The Law Prohibiting the Warrantless Search of Plaintiff's Home Was Clearly Established. Defendants' argument that their entries were permissible under the "implied license" doctrine articulated in cases like *Florida v. Jardines* and *United States v. Shuck* is a gross mischaracterization of both the facts and the law. The implied license is a limited one, allowing officers to "approach the home and knock, precisely because that is no more than any private citizen might do." *Jardines*, 569 U.S. at 8. It does not grant police a license to roam and explore private areas of a home or business that are not open to the public.

Here, a reasonable officer would have known they were far outside the bounds of any implied license. Reaching Plaintiff's private stairwell was not like walking up to a suburban front door. It required a multi-step intrusion into areas no ordinary visitor would ever be permitted to go:

1. First, officers had to enter the public bar.

2. Second, they had to proceed through a non-public, private kitchen area of the business.

3. Third, they had to open another door leading to Plaintiff's private stairwell.

4. Bar employees specifically told them " that's private quarter you can't go up there, Please come back down."

No reasonable member of the public would believe they had a license to take such a path. The law is clearly established that an expectation of privacy exists in common areas of buildings that are kept private and not open to the general public. *See United States v. Reeves*, 524 F.3d 1161 (10th Cir. 2008) (finding a Fourth Amendment violation where officers entered a locked, shared breezeway of an apartment building).

Furthermore, even if a sliver of an implied license could be imagined to exist, it was explicitly and unequivocally revoked. First, the prominent "NO TRESPASSING" sign terminated any license to enter the stairwell. *See United States v. Carloss*, 818 F.3d 988, 1000 (10th Cir. 2016) (Gorsuch, J., dissenting) (explaining that a "No Trespassing" sign is a clear revocation of the implied license). Second, and more damningly, bar staff gave officers a direct verbal order: "You can't go up there, it's private quarters". At that moment, any possible justification for their presence disappeared. Because the law on the limited nature of the implied license and its revocation is clearly established, no reasonable officer would have proceeded past these multiple physical and verbal barriers.

The Law Prohibiting the Retaliation and Excessive Force Was Clearly Established. It is likewise clearly established that retaliating against an individual for exercising their constitutional rights is unlawful. *Worrell v. Henry*, 219 F.3d 1197 (10th Cir. 2000). The law does not require the adverse action to be an arrest; actions such as issuing a baseless traffic ticket, seizing property, or making credible economic threats are sufficient. *See Poole v. County of Otero*, 271 F.3d 955 (10th Cir. 2001). No reasonable officer could believe they could constitutionally tow a citizen's car or threaten to shut down their family business simply because that citizen protested an illegal entry or demanded a warrant.

Finally, the right to be free from excessive force is clearly established. This includes the right to be free from a prolonged armed siege combined with explicit threats to deploy chemical weapons against a non-threatening family secured in their own home. *See Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179 (10th Cir. 2001) .This right is particularly clear where, as here, a supervising officer Oliva admits on camera that the entire siege was conducted without legal justification, stating: **'Good thing we got the guy 'cause we had no probable cause for a warrant.'**" A reasonable officer is not free to ignore facts that render their use of force unreasonable. *Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008).

Because the alleged conduct violated rights that were clearly established at the time, qualified immunity is inappropriate and should be denied.

## IV.   CONCLUSION

Defendants' Motion to Dismiss fails on every ground. The Second Amended Complaint states plausible claims for relief under both federal and state law.

### A.   Alternative Request for Leave to Amend.

If the Court identifies any pleading deficiency, Plaintiff respectfully requests leave to amend under Fed. R. Civ. P. 15(a)(2). Leave should be freely given when justice so requires. The requested amendment would clarify any ambiguities, add pinpoint factual allegations, and conform headings to the claims as pleaded. Amendment would not be in bad faith, would not unduly delay these proceedings, would not prejudice Defendants, and would not be futile.

For the foregoing reasons, Plaintiff respectfully requests that the Court **DENY** Defendants' Motion to Dismiss in its entirety and allow this case to proceed to discovery.

Dated: October 20, 2025

Respectfully submitted,

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of October, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Harry Cooper
Harry Cooper
Plaintiff,
112 W 7th Street
Pueblo, CO 81003
(719) 717-7191
coop.7th@gmail.com